May it please the court. My name is Tim Balson and I represent the appellant Hannah P. in this case. Just so the court is aware, Hannah is sitting right behind me in the white at the council table today. Hannah was a top performing employee at ODNI who was on temporary reserve status. She suffered an acute episode of her major depressive disorder that climaxed in March and April 2015. As you've seen from the briefs, ODNI failed to properly handle what could have been a short-lived depressive episode, exacerbated her disability, cost her a permanent position with ODNI, and ultimately cost her her career in the intelligence community. We filed this case in the Eastern District of Virginia asserting claims under the Rehabilitation Act and the Family Medical Leave Act. We now are here on appeal because the trial court wrongly decided on summary judgment that all of our sub counts failed to provide even a that finding of the trial court. And we also are here on summary judgment on our FMLA interference claim and our wrongful use of the employee assistance program, which I'll refer to today as EAP, in a hiring decision because there are no facts in dispute and judgment should be found in my client's favor on those. I'd like to begin with a discussion of our FMLA claims. Looking at the FMLA interference claim, there are only two elements that need to be proved. Interference and then was found in the Vinoy case that if an employer fails to provide the FMLA notice required by the code, that alone is sufficient to show interference. In this case, ODNI did not even identify her disorder as FMLA qualifying and certainly did not provide any notice of her right to FMLA leave. Additionally, the second element as to prejudice. We've listed multiple items of prejudice, but I would just note that the inability to take her leave on April 9th when she requested it was prejudice. The requirement that she use her annual leave instead of sick leave when she went out on leave on May 4th was also prejudice. If she had been known that she had the right to take sick leave, she would not have needed to expend her annual leave, which could have been paid out to her when she left employment the next March in 2016. Now, ODNI's defense to this is that my claim they did not hire her in July because she was not performing the essential functions of attendance. They say she doesn't have a health issue in April at the height of her depressive episode when we have conceded that she was not able to perform the function of attendance during that three-week time period, basically. Under the regulations of the FMLA, to show the serious health condition, all we had to provide was that our client had a chronic condition, which ODNI admits that she had depression as such a condition, and that she was unable to perform the functions of the job, which is found, this is 825.123 of the FMLA regulations, if a health care provider finds you are unable to work, which we clearly had here, as Hannah had two medical providers of hers recommend or prescribe that she take the leave that was denied. Similarly, on our FMLA retaliation claim, Hannah was denied the cyber job 36 days after she returned from FMLA leave. Obviously, that's a very close temporal proximity. But there was a number of non-retaliatory reasons for that given. All of her absences and tardiness despite best efforts to accommodate her. How many absences and tardiness and failures to comply with the accommodations should she have gotten? Well, Your Honor, as we argued in our brief, she was not provided a schedule until March 19th. She was denied her leave on April 9th. We would argue that none of the absences or tardiness after April 9th should be counted against her because those were caused by the wrongful interference of her FMLA leave. And additionally- So that must be why you say that in your brief you say you only identified two unexcused absences and nine instances of failure to report. Those must be before April 9th because I count up at least 17. And even of the ones that you identified, nine instances of failure to report tardiness. Why isn't that enough? That's 11. Yes, Your Honor. Because these absences were a direct symptom of her disability. And we can argue about it. I was going to get to this later on the Rehabilitation Act. But this Court has found that when a condition like absences is related to a disability, then it's a matter of degree. Obviously, we're not arguing- For qualifications, the cases that talk about that talk about the qualifications element of a wrongful hire or wrongful termination. To the extent we have it in this case, it's about pretext, I believe. And to follow up on what Judge Thacker said, didn't the post-April absences, weren't they attributed by your client to traffic and migraine issues as opposed to the depressive condition? Yes, Your Honor. We do question the statement by ODNI that she made other excuses for all of her absences. It was a handful of the absences. Most of them she said, you know, I'm going to be late or I'm not going to be able to make an end today without a description of the reason. So there's a fact question there as to those absences. So you're saying she either gave no reason or it was, as Judge Quattlebaum said, traffic or migraines? Your Honor, two things on that. My client is in the EAP referral, has already disclosed to her employer at this time that she suffers from major depressive disorder. And that was the cause of her problems. She says that. They cite that. Art, her supervisor. But were there also times when it was traffic or migraines? Yes, Your Honor. But FMLA, and I want to, let me parse that out. Because traffic, migraines, work on her house, it doesn't separate out the fact that this was hard to function. Depression makes it hard to report. These were tied to her depression. All of these incidents were tied to her depression. But what I wanted to say was, under the FMLA, the employer has a duty to inquire, and this is the Miller case, on each requested leave. So every day that she requested leave, they should have looked at it individually. Is this for depression? Is this for some other reason? And we're not here to claim that every day was depression. They could have excluded some days, probably. I think March 30th, she was out for construction. She stated that. But the large majority of these absences were absolutely because of her depression. And maybe, as the EAP psychologist also said in her sworn statement, because it's exacerbating her depression. We're not saying they're unrelated, but they're inextricably linked, that these conditions. Let me get to your, if I could follow up on, they're tied to her depression. Please don't take this at all as any indication that this court, or myself, doesn't consider depressive issues as very serious, legitimate issues. But if you look at the Fourth Circuit law on this, it looks, the Vinoy case, the Tyndall case, and even the Rohine case, seem to make clear that the effects of a disability are appropriate matters for an employer to consider. The only case that might be an exception to that is the Martinson case. And in that situation, you have seizures and epilepsy, which are, I think, more closely connected than the effects of depression to the situations we have here. So, do you dispute that the employer was not able to consider the effects of your client's condition in its decision making? Your Honor, no. We believe the employer could consider these items. That's not our point. The point is that it's a matter of degree, and that we found these to be de minimis. Now, that's a fact question. That's our position on the leave and attendance. But we found it to be de minimis. And so, while they could look at it, it wasn't a big deal, basically, until, again, after April 9th, which was caused by their actions. I understand that. That would seem to me to make sense if a district court had ruled on the qualifications. Was she qualified to do the job? I would understand there may be a question of fact about that. But that wasn't the basis of the order. The basis of the order, at least on the non-hire calls, was pretext. And you argued that it was pretext when the employer gave a non-discriminatory reason. So, it seems to me, I'd like you to address that. How would that be a question of fact on the pretext if it was based on a non-discriminatory reason? Your Honor, I think I may have lost your order. Yeah, I'm sorry if my question wasn't clear. I can understand how the degree of the absences would be potentially relevant if the district court had ruled that your client was not qualified. But, and I'm not talking about the FLMA, I'm talking about the non-hiring claim now. But what the district court ruled on was the pretext claim. And that seems like when they give a non-discriminatory justification, I don't see how the degree would create a question of fact about that if all the reasons given were due to non-discriminatory reasons. Well, Your Honor, our argument is you cannot separate out her depression from the symptoms of her disability, like Martinson, the epilepsy case that you referenced. We don't see a distinction between Martinson and our case. Depression causes insomnia. Depression causes you to be unable to report on time. I think that's commonly known. But how do you square that with Vannoy, which had, that point had depression and had effects of it. And this court said they could consider that. In unquestionably a disability, and the court said that you could consider the effects of it. This court said that. And so I don't, I don't see how you're saying you can't separate those two. Absolutely, Your Honor. Let me speak, let me speak to what you're saying about Vannoy. The finding in this, by this court and Vannoy was, an employer doesn't have to overlook blatant and persistent misconduct. The distinction here is there is no evidence that my client did anything willfully or intentionally to insubordinate the Vannoy basically stole the vehicle, refused to fill out an EAP, or excuse me, a performance improvement plan. That is not the case here. All the evidence shows that my client desired to do the right thing. Sure. It's, it was against her volition because it was her disability. It's no different than saying to someone who has no legs, walk to the second floor. They would like to get to the second floor, but they have no legs. The only difference here is this is a mental condition, so you don't readily see it. It's not physically maybe apparent, but that's exactly what was happening. She was trying to do the right thing. It was not willful insubordination like Vannoy, nor was it blatant and persistent misconduct. Like Tyndall, if you take that as an example, 40 absences in that period, I think it was six per month. Right. I mean, excessive, I would agree with Odie and I, that was excessive absenteeism. That's not our case. So is the issue you're making not that you can't separate the effects, but that your clients are not of the same degree as those cases? Well, I would say it's not even the same kind, because willful insubordination is very different than the situation we have here, where you're trying to get to work, but you're just late because of your disability, or you're unable to make it. So I would say it's different in kind and degree. I guess kind from Vannoy and degree from the Tyndall case, Your Honor, would be my position. I would like to speak to the pretext, because the court has mentioned that, and the trial court didn't mention pretext at all. And that is largely what we rely upon to show, because this attendance was so linked to my client's disability, that the employer should have clarified, or at least caused into question, that it was not the disability as opposed to the attendance issue. And here we have Mr. Ewing saying, in a sworn statement, I didn't even know she had a disability, therefore I could not have based my decision on that. That is pretext, and that was all we needed to survive some judgment. Real quick, before you sit and make your notice argument on the FMLA, why there's a genuine issue of fact on that. Notice as in, they didn't provide her FMLA notice? Yes. Well, Your Honor, the duty is on the employer to inquire, once they're put on notice of a leave request, that could be medically related. It's a very low bar for the employee, and they failed to do that. And as the court said in Vannoy, once you're on notice of a potential medical issue, and you don't inquire, and you don't provide them the employee notice, look, we wouldn't be here today if they had provided my client notice of FMLA, and they had done a second opinion on her doctor's report, instead of using this bogus EAP counseling, which was really just a pretext to get her to stay at work, because they thought it was better for her to be at work, and not isolate a single woman at home when she has this condition. You know, that goes for other people. And today, I can see my time's almost out, they absolutely were on notice of her condition under FMLA. They had a duty to provide her the notices that were required in Vannoy, and they failed to do it. There's just no question about it. And now they come and say, well, we didn't know how serious her condition was, though their EAP referral says she was paralyzed, their words, trance-like. I don't know how more serious a condition can be. And all the testimony of her decline in health was stark up until that time when she asked for her leave. This case is clear. It shouldn't even be a fact question. It should be decided in our favor, assuming judgment on that issue. I see my time has expired. I'll be back with you. Thank you. Ms. Lopez. May it please the court, Carolyn Lopez on behalf of the government. I'll start off with the rehabilitation claims. So I did just wanna point out to get to your honor's questions about whether or not this misconduct here falls squarely within this court's trilogy of cases in Vannoy, Tyndall, and Martinson. It very clearly does, even if one were just to take the period of time after which she got a reasonable accommodation. So she got her first reasonable accommodation on March 19th, which she says she agrees was a reasonable accommodation. After that period of time, on five out of six of the days on which she should have complied with that, her part in that reasonable accommodation, she doesn't do so. And so that's very similar to what plaintiff's counsel just said would be sufficient misconduct under Tyndall, six absences in one month, five out of six missing right after getting a reasonable accommodation. And importantly, what she told us... And what was the reason for the accommodation in March? So in March 19th, her supervisor approached her and said, listen, for the past several months, you have not been... We haven't been able to depend on you. You haven't been showing up regularly. What was the reason for the accommodation? You used the word, which is a legal term in that sense, that means something, right? What was the basis for the employer making accommodations for her? What was the reason? Not what were the accommodations, what was the reason for the accommodation? So on March 19th, when her supervisor, Roy, approached her to say that this has caused serious problems for us, she at that point disclosed to Roy for the first time that she had depression, at which point... She first disclosed what? That she had... That she'd been diagnosed with depression. With depression, correct? With depression to her supervisor. All right. And therefore, having done that, the employer felt it was necessary for accommodation, correct? Correct. So... All right. Now, what were the accommodations? The accommodations were... The accommodation was threefold. First, her supervisors allowed her to come in at 10 AM, which is significantly later than other employees. This court in Holstred, I hope I'm pronouncing that correctly, has said that, for example, moving an employer's time from 8 AM... But having already, as you can see, that she told you she was involved having chronic depression, wasn't she entitled then to be considered for... Be noticed that she doesn't have to have accommodation in terms of working, that she should be off? No, that she didn't ask... She didn't ask... The first time she asked to be off is, as a factual matter, the very first time she asked to be off is April 9th. So anything... So she was working through it, trying to work through it? She was trying to work through it, and... But one thing I... And she was not successful in trying to work through what was already identified as depression. But... So is that right? And this is just... When it's yes or no, you can do yes or no, and then you can explain. But in the correct... She was working through an undisputed chronic depression diagnosis. No, that's not correct. That's not... Okay, what was she working through? That's not correct on this record, because the contemporaneous reasons that she gave for those absences that, again, are the absences... No, no, no, no, you don't... Excuse me. I'm not saying what her reason is. The point is, she had a diagnosis of chronic depression, correct? Right? Right? That's correct. Okay. And then you worked it out where she could continue to work with what you call accommodations by adjusting her hours of reporting, correct? By both adjusting her hours of reporting and by giving her alternate easier means to get in contact. Correct. But see, the thing is that you then saying what happened subsequently were reasons like traffic and things. That's what depression does. What other people say, you get up on time. It's like telling somebody with depression, why don't you just cheer up? They can't, because they're depressed. It's depression. See, that's the problem with this case, is you're saying, well, we gave her a chance to come in at 11, but she still couldn't get him at 11. Duh, because she's still under depression. It's like telling somebody, well, you know, I have a problem with my vision and I'm going blind. Well, we'll try to work through this. Well, you know, they're still bumping in this stuff. We gave them a chance. That's because they're losing their sight. No, Your Honor. Respectfully, both as a record matter and as a matter under this court's jurisprudence. So the record matter is, ODNI was the weighty decision of whether to make her a permanent employee, that her excuses directly after these accommodations were not traffic or migraine. They were related to her home renovation. I'm glad you said that, because you know what this is? You can consider the effects, but you can't do it by saying when you are the one, Pop, you're responsible for some of the effects. And this is not a case where blatant violations and misconduct. What you're doing, you're saying, well, she was suffering from chronic depression. You tried to accommodate, but she didn't meet your standards. So you affected her late, those kind of things. And then when she's with a stellar record, everybody on the panel said, this lady is like qualified on steroids. Like, why are we waiting? She should be here tomorrow, right? And then you said, oh, no, we're not going to hire her, because when you were with us, you had a bad attendance record. Because you didn't, she was under depression. She should have been out. And then you fought her over when the doctor said she needs how many weeks? No, you don't need that many weeks. You don't need that. Let me put you in your EAP. And then you try to act like you were a psychiatrist and you were doing that. You kept her there when she should have been at home trying to get well. And it's really a horrible case, because it's a situation where you are basically saying you don't get hired because you were dealing with a real and undisputed medical condition. Why is it not? No, Your Honor, this is a case that fits squarely within this Court's jurisprudence in Vinoy, Tindall, and Martinson. But what about the Family Medical Leave Act argument that was passed? I'm happy to address that. I did just want to make sure that I addressed Judge Gregory's question on the Rehabilitation Act, which is that under this Court's trilogy of cases in Vinoy, Martinson's, and Tindall employees, and including Martinson, which is the one case that plaintiff relies on, in Martinson footnote 3, the Court says, firing for, quote, disability-related absences is an appropriate reason to take that adverse action. So here, under a plaintiff's rule, the problem is, I agree, it is a difficult case. But under plaintiff's rule, the problem with plaintiff's theory is that what it would mean is that a national security agency couldn't take into account recent significant attendance and reporting problems, which were documented at JA 412 through 14 as lasting from January 15th through April, when deciding to make permanent hiring position. And the selecting official made clear at JA 635 through 36, and his deposition testimony, such as at JA 219, that he was open to hiring her. She'd only been back after a month. He said, she has eight months left on her term. I remain open to hiring her for another position if she applies when she has a demonstrated period of dependability. And she didn't apply, despite the fact that as plaintiff admitted in her deposition testimony at JA 51 through 54, her supervisor, Kelly, told her that that was the reason, and in fact encouraged her to apply if she could have a period of dependability. To get to your Honor's FMLA question, there are two that we argue, but this Court doesn't need to reach, because I agree that it's a difficult question. There sort of wasn't actual, there wasn't sufficient. She didn't put her employers on sufficient verbal notice because the range of excuses ranged. What? Her employers weren't on sufficient notice? That she was necessarily asking for FMLA leave related to that. But again, if your Honor's... What about the duty to inquire? Again, if your Honor's disagree with us on whether or not, as a matter of best practices or under the FMLA, they should have given her notice, we would still prevail in the FMLA claims for two reasons. The first is this threshold question of whether she actually had a period of incapacity, which is a different question under the FMLA than it is under the Rehabilitation Act. And the second is that she wasn't actually prejudiced. Aren't you, on this issue, aren't you talking out both sides of your mouth a little bit on that? I mean, to say she isn't capacitated on the one hand, but before you're saying her problems... I think the arguments about the ability to consider effects are things that I'm sympathetic to, but then to then say it's not serious enough seems like you're talking about both sides of your mouth on the FLMA notice claim. No, and I think the reason for that is that the standards under the Rehabilitation Act, which is just whether an employer can take in, to context, the sort of misconduct and workplace performance issues that it would for any other employee when making a permanent hiring decision, is different than the FMLA's regulations, which define a period of incapacities and inability to work or to perform other regular functions. Even if they're different, I mean, if there's a question of fact, that's what we're here on. We're saying there's not even a question of fact on notice. Oh, sorry. I'm talking about the period of incapacity, which is a little bit different than the notice question. So your honors don't need to actually decide whether they were sufficiently on notice that they should, as a matter of good practice, have given her notice. The question of whether she was incapacitated for purposes of the FMLA is a different threshold question, and that in the regulations is defined, again, as an inability to work or to perform other regular activities. Well, didn't she have an inability to work? At least a question of fact as to whether she had an inability to work. So as we discussed in our brief, the contemporaneous record evidence, and what she says in her own brief is that even during the peak of her depressive episode in April, the plaintiff herself says in her opening brief that she was able to complete all of her work. And right before she goes on that FMLA leave that she's given, she emails her supervisor to say, I'm going to go visit my brother in New York for a few days, and then I'm able to come into work if something comes up related to the project I'm going to be staffed on. So we would argue that that doesn't, under the very strict standards of period of incapacity under the FMLA, it doesn't meet a period of incapacity. Even if your honors didn't agree with us on that, I do want to talk about the prejudice element because she would have to show actual prejudice and she can't here. So what's your argument on that? Explain the prejudice argument. I want to hear what your position is. Absolutely. So she says that she was prejudiced in basically three ways. But so she says primarily at the podium today, her counsel has talked about that she would have taken a different sort of leave if she'd known, and that's actually not correct under the FMLA. So what plaintiff herself says is the reason that she didn't take the leave is because she was worried that had, so Art told her, actually within three days of when she first asked for leave on April 9th, within three business days, her supervisor Art said, we will grant you between two to four weeks of leave. They weren't disputing that. But if you take more than two weeks of sick leave, we're required under ODNI policies, which are the same as the CIA's policies. This is at JA 156 through 57 to, sorry, JA 156 to 157 is the actual policy. So Art was right. I've read through the record as best I could, but explain why the government disputes she's been prejudiced. Not what her claims are, but tell me why she has not been prejudiced. So she says, if I had known that I was entitled to take FMLA protective leave, I would have taken it all as sick leave instead of as annual leave. But the reason that she says, and including in the reply brief that she says that she would have taken that leave as sick leave is she would have then known that she would have been protected even if she did the fitness exam. But that's actually not what the FMLA says. So at 29 USC 2612 D2B, the FMLA specifically says employers are to provide, can at their option provide paid sick leave or paid medical leave in any situation in which such employer or cannot be required to provide paid sick leave or paid medical leave in any situation in which such employer would not normally provide any such paid leave. And what that means here is because under a normal sick leave, just I'm feeling under the weather. I haven't been diagnosed with anything, but I'm going to need to take a month off of sick leave. I've got a really bad flu. The employer here could still under its regular sick leave policies require me to take a fitness exam upon my return just to, and I wouldn't be protected because of the FMLA. Okay, but I don't understand that because she didn't, she wasn't just feeling under the weather or have a flu. So why wouldn't the employer have been required to give her sick leave under the Family Medical Leave Act? So the employer, but the employer would have, would have been required under the FMLA to give her FMLA leave here replaced with paid sick leave. But what she says that the reason that she took annual leave instead of sick leave is because she was worried that she might have negative consequences from the fitness exam upon her return. That fitness exam is required when any employee takes sick leave of more than two weeks, whether that's sick leave under the FMLA or regular sick leave. And the FMLA itself, again, at 2612 D2B expressly says that the employers are allowed to apply the same rules. So even had she gotten her FMLA notice, her same concern about being... Yeah. So that's what you're saying that, and I guess I understand what the argument is, at least, is that they, the concern she expressed would have also been concerns under the leave she says she would have taken. That's right. And so she still would have been faced with the exact same choice of taking it on annual leave or being subject to the medical exam upon her return. I got you. And then the other form of prejudice is that's where the FMLA claim and the Rehabilitation Act claim sort of come together, which is that there were, that there's no evidence that she wasn't hired because... What about this reasoning about, I guess, if she had been a man, she would have been allowed to go home? So that argument goes only to the question... Not argument. I'm talking, is that a fact that they said something like, because you're a woman, we don't want you by yourself? No, we just... You dispute that? No, we dispute that. But also... You dispute that that was ever told to her? That's correct. We dispute that that was ever told to her. So that's a disputed fact. That's a disputed fact, but... Everybody has something to do with your animus, isn't it? If that's true, that you were making a difference because you're a woman, you need to be around us so we can take care of you and you can work. You're a man, you can stay at home by yourself. Wouldn't that, since that's a disputed fact, if that's true, would that show animus in terms of discrimination? No, Your Honor, for two... Why wouldn't it? No, Your Honor, for two reasons. First of all, even taking plaintiff's assertion as true, it doesn't matter for the analysis of this case. First of all, because she said that only with respect to her supervisor, Arch, she never said that with respect to the actual selecting official, Mark Ewing, so it wouldn't go to whether or not Mark Ewing acted pretextually when he, based upon the record evidence in front of him, including an EAP referral, said that this was just too disruptive, the absences and misconduct. And second of all, I do just want to clarify that plaintiff doesn't actually make that argument, correctly does not make that argument with respect to pretext. That only goes to the question of whether the EAP referral was improperly motivated and under this court's decisions in Kersey and in Pence, as plaintiff acknowledged at plaintiff's opening brief, page 39, that's an objective question in which, and specifically in Pence, this court said we don't need to resolve factual disputes about the subjective intentions of the employer in referring somebody to an EAP, and that was an EAP process too, an EAP process if there's sufficient objective evidence. And here there's sufficient objective evidence of attendance and reporting issues, which at JA-131 is a paradigmatic example of why one would send somebody to an EAP referral. And you sent her there and you did sort of a psychological workup on your own? Was there some kind of psychological workup done when she was in EAP? You called it counseling. Did you do some profiling in that sense? No. What did you do? No, the EAP counselor said she didn't actually perform a medical diagnosis, but again, even if this, that may be a difficult question because the everything that you can't answer is like a difficult question. It's a straightforward question. What did you do when you subjected her, I would almost call it, to this EAP? Counseling, you called it. And then didn't you also disclose some of that, you meaning the employer, disclose that information? So I want to answer each of those questions in turn. First, even assuming that this was a medical diagnosis, that this was for medical reasons, that's allowed under the Rehabilitation Act at 12-1-1. What were you trying to rehabilitate her from? Work late? That was it? What was the rehabilitation? When you're rehabilitating somebody, you're bringing them back from something. What were you bringing her back from? As documented in the EAP referral at JA-412 through JA-414, since mid-January up through April, the plaintiff had been absent, as Judge Thacker mentions, absent or tardy without sufficient notice at least 17 times. Now that's relevant. And I do want to just take a moment here to talk about, because I think we haven't talked about why the reporting. But you weren't rehabilitating her from absenteeism in the EAP. You were rehabilitating her from her depressive episodes, which I think is what Judge Gregory is asking you. No, I would disagree with that. What they thought that they were doing, as is true as in the face of the EAP referral, is they weren't sure what was actually causing her absences. Because sometimes, such as when she didn't give an example, or when she generally told them that she'd been diagnosed with depression and was having trouble getting out of bed, it might have been related to depression. But other times, it wasn't just that she was calling in and saying, I can't come in. It was sometimes, I'm doing home renovations. Again, that's not depression-related. So they just didn't know what was going on. But what they did know at the time was that this was causing serious workflow and even morale problems. And, again, that's a paradigmatic reason to send somebody to EAP. And the Rehabilitation Act itself specifically provides that even if this was a medical diagnosis, even if it wasn't voluntary, which, again, we have arguments in our brief for why that's not right. But I would guess that, Judge Gregory, those do not convince you. Well, good, you're reading my mind now. Under the Rehabilitation Act, they're allowed to send somebody to EAP. I guess you're experts. Under the Rehabilitation Act, under 12.1.1.12.D.4, you're allowed to send somebody for an evaluation when it's job-related and consistent with business necessity. And, again, it was here. I see my time has expired. Judge Gregory, can I ask one more question? Sure, absolutely. I understand, I think, the argument about job-related under the medical examination question. Is there, I mean, and I get the argument that it might not have been the MD doing it, but before we get to the job-related issue, don't the EOC regulations in their explanation of what's a medical examination, what's your position as to how the EAP program did not constitute a medical examination? So, as we argued in our brief, our position is that because the EAP psychologist, who's the person who's sort of qualified to know whether or not she was actually performing a medical diagnosis, said that she wasn't performing a medical diagnosis. Just because it wasn't a MD? It wasn't. I got you. And is there, last thing, and I'm sorry for this last bit, but is there anything in the record that was disclosed from the EAP process that she had not disclosed herself? No, so on the face of the EAP referral itself, which happens obviously before she actually undergoes any EAP counseling, so, again, that's JA-414. I believe this particular PIN site is JA-413. It says Hannah has disclosed to us that she has depression, is seeing, I forget whether it's a psychologist or a psychiatrist, and is taking medication for that depression. And so that's precisely the purportedly confidential information. And the only thing that plaintiff has actually identified that would have been unique information is this question of whether or not she was concerned about a paper trail, but that's not confidential medical information. Thank you. Thank you. Hey, police court. I wanted to respond to several things that were said, and I think the court is cognizant of this, but what is so shocking in this case is that the employer admits she has depression. They conceded that in this case. They then proceed to question that depression should cause all these problems that my client and her doctors have testified and is in the record were absolutely caused by her depression. But isn't one of the reasons they're doing that is because she keeps, and maybe this is part of the condition, but her explanation to them every time about specific instances was a non-depressive reason, it seems to me. Your Honor, first off, these reasons that were given were on e-mails sent to administrative staff. So my client is not going to disclose, hey, it's my depression again, guys. That's not fair of the employer to ask a client to do that. So, of course, she looks for some alternative reason. We all know how it is. We're 30 minutes late, but we're five minutes more late because of traffic or whatever, so we say it's traffic. It's not untrue. But it's also because of her depression that made her 30 minutes late getting out the door, and she's not going to disclose that. It's not fair to request that of her, and these are supposed to be put in e-mails as they've conceded. We do dispute this factual statement that she missed five days after the reasonable accommodation on March 19th. She agreed to put them in e-mails, right? She agreed that was a reasonable accommodation, correct? Not to put her status of depression in e-mails. She agreed to notify them via e-mail if she was going to be late or absent. That is correct. By a certain time of day. Yes. I want to say, I mean, the important thing about this reasonable accommodation, the first one on March 19th, was that she was going to get a phone call at 11 o'clock if she was late. They never followed that. Not one time. Never called her one time. Now, I agree. I see the court shaking its head. I agree that it might not be a reasonable accommodation. They agreed to it, okay? So if you agree to it, you have to comply with it. That's what the law says. They didn't have to agree to it, but they did. And once they did, they didn't even try to comply with it. And then they get mad at her and say, oh, you're not holding up your end of the bargain. They did two. We asked them questions about the FLMA, but, I mean, they gave her three accommodations. And the first two were coming in later and notify them. And each time she, you know, there's the evidence I think is undisputed that she did not do that. She didn't provide the notice. So, I mean, you know, I'm sorry. Sure, yeah. They had a maxi flex schedule, which said you get your work done, you can come in whenever you want. I mean, that was the schedule up until March 19th as far as my client knew. And then they say, well, you can't come in whenever you want. You need to come in at 10. That really wasn't an accommodation. That was we're getting more strict, we're making you come in earlier. And now, look, my client has depression. I understand she didn't comply. But that's why they set up the 11 o'clock phone call. Counselor, you put this case a little bit in context, right? She worked on an incredible important project for a long time, didn't she? Yes, Your Honor. Yeah. And how many hours did they care about how many hours she was staying there working then? She had so much annual leave that she could take four weeks because she'd built up so many hours working on this noted matter. Okay. Were they worried about what time she came in then in terms of flex time? No, Your Honor. Right. Not at all. But when she said she had depression, it was different. Yeah. Then she has to get in at 10. And then they said they would help her transition. They didn't. And then when she was failing, as the court pointed out, she asked for leave. They denied it. And before you sit down, this time I want to make sure you respond to the prejudice argument opposing counsel, because she said that your client wasn't prejudiced somehow. I can't believe that because not only we've argued, counsel said that this leave issue, which is not correct, she could have taken sick leave. She had medically prescribed leave. That should be a request for sick leave that was allowed under OD&I rules. But more than that, she was denied the hiring for the cyber position based on her absences April 9th to May 4th, after they interfered with her FMLA leave. She also had increased medical costs because she had to go back to her doctor during this time and get heightened medicines. The prejudice is shocking. I mean, we can go on. Those are just the first few levels, but the prejudice is clear on that. If I could say, because I do think this is a unique case, and we have moved for summary judgment on this issue of the medical examination because it was used in a hiring decision, there is no way to dispute that Mark Ewing's email sent on June 30th, once all the leave issues, reasonable accommodation issues were taken care of, the email he sent to the principal deputy director at OD&I was about a hiring decision. That's all that email could have been and was, and it is inappropriate to use medical information in a hiring decision, whether it's helpful medical information or unhelpful medical information. It doesn't matter. It's not allowed in a hiring decision pre-employment context. Thank you, counsel. Thank you. We'll come down, greet counsel, and proceed to our next case.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.